**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

LINDA M. FRAWLEY

                           Plaintiff,

     v.

CAROLYN W. COLVIN, Commissioner of
Social Security Administration,

                           Defendant.

No. 13-CV-1567
(LEK/CFH)

_____

**APPEARANCES:**

THE OLINSKY LAW GROUP
Attorney for Plaintiff
300 S. State Street
Fifth Floor, Suite 520
Syracuse, New York 13202

HON. RICHARD S. HARTUNIAN
United States Attorney for the
    Northern District of New York
Attorney for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

**OF COUNSEL:**

HOWARD D. OLINSKY, ESQ.

LAUREN E. MEYERS, ESQ.
Special Assistant United States Attorney

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff Linda M. Frawley ("Frawley") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Frawley moves for a finding of disability and the Commissioner cross-moves for a

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings. Dkt. Nos. 10, 11. For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on April 25, 1962, Frawley was forty-two years old on the alleged disability onset date. T. 29, 197.[2] Frawley graduated from high school and completed an associate's degree from Bryant and Stratton college in applied sciences. T. 381. Frawley's previous work experience included various secretarial positions, a help desk clerk, cashier, and child care provider. T. 29-32, 201. Frawley alleges disability from anxiety, diabetes, and high blood pressure. T. 213.

### B. Procedural History

On December 28, 2010, Frawley protectively filed a Title II application for a period of disability and disability insurance benefits and on January 10, 2011 also protectively filed a Title XVI application for supplemental security income claiming an alleged onset date of October 1, 2004. T. 10, 163-175, 198. Those applications were denied on March 9, 2011. T. 57-58. Frawley requested a hearing before an administrative law judge ("ALJ") and a hearing was held before ALJ David J. Begley on May 21, 2012. T. 24-56, 81-155. In a decision dated June 28, 2012, the ALJ held that Frawley was not entitled to disability benefits. T. 7-23. Frawley filed a timely request for review, and on

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Docket No. 8.

October 25, 2013, the Appeals Council denied Frawley's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 1-6, 161.  This action followed.

## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## B. Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is

---

[3] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

currently engaged in substantial gainful activity.  If he [or she]
is not, the [Commissioner] next considers whether the
claimant has a 'severe impairment' which significantly limits
his [or her] physical or mental ability to do basic work
activities.  If the claimant suffers such an impairment, the third
inquiry is whether, based solely on medical evidence, the
claimant has an impairment which is listed in Appendix 1 of
the regulations.  If the claimant has such an impairment, the
[Commissioner] will consider him [or her] disabled without
considering vocational factors such as age, education, and
work experience; the [Commissioner] presumes that a
claimant who is afflicted with a 'listed' impairment is unable to
perform substantial gainful activity.  Assuming the claimant
does not have a listed impairment, the fourth inquiry is
whether, despite the claimant's severe impairment, he [or she]
has the residual functional capacity to perform his [or her] past
work.  Finally, if the claimant is unable to perform his [or her]
past work, the [Commissioner] then determines whether there
is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing

Berry, 675 F.2d at 467).


### C. ALJ Begley's Findings

   Frawley, represented by an attorney, testified at the hearing held on May 21, 2012,

as well as a vocational expert.  T. 24-56 (transcript from the administrative hearing).

Using the five-step disability sequential evaluation, the ALJ found that Frawley (1) had

not engaged in substantial gainful activity since October 1, 2004, the alleged onset

date; (2) had the following severe medically determinable impairments: dysthymia (late

5

onset), adjustment disorder with anxious mood, and personality disorder; (3) did not

have an impairment, alone or in combination, sufficient to meet the listed impairments

in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintained

> the residual functional capacity [("RFC")] to perform a full
> range of work at all exertional levels, but with the following
> nonexertional limitations: simple, routine, repetitive tasks;
> work in a low-stress job, defined as having no fixed
> production quotas, no hazardous conditions, only occasional
> decision-making required and only occasional changes in the
> work setting; and occasional interaction with co-workers and
> the general public

and thus, (5) given her age, education, work experience and RFC, remained capable of

performing employment which exists in significant numbers in the national economy.

Therefore, a determination of not disabled was made.


### D.  Frawley's Contentions

Frawley contends that the ALJ erred in concluding that substantial evidence in the

record supported a finding that Frawley retained sufficient residual functional capacity

(RFC) to perform work.  Specifically Frawley alleges that the ALJ did not properly

evaluate the medical evidence or her credibility when determining her RFC, or correctly

conclude that, based upon that RFC, Frawley could perform work that existed in

significant numbers in the national economy.


### 1. RFC

The ALJ determined that Frawley retained the RFC to perform work at all exertional

levels with specific limitations.  T. 14-17. Namely, the ALJ concluded that Frawley could

perform a full range of work at all exertional levels, but with the following nonexertional limitations: simple, routine, repetitive tasks; work in a low-stress job, defined as having no fixed production quotas, no hazardous conditions, only occasional decision-making required and only occasional changes in the work setting; and occasional interaction with co-workers and the general public .

T. 14. In determining as much, the ALJ gave

the State agency psychological consultant['s] . . . opinion limited weight in that it fails to state specific limitations with regard to [Frawley's] mental functioning, but notes [Frawley] has medically determinable psychological impairments[; t]he psychological consultative examiner['s] . . . opinion great weight because it is generally consistent with the medical evidence of record as whole, which note [Frawley's] psychiatric diagnoses, GAF scores[4] consistent with mild to moderate limitations in social functioning and improvement with psychotropic medication[; t]he . . . treating mental health care provider['s] . . . opinion little weight because it is generally inconsistent with the medical evidence of record, which notes [Frawley's] improvement with psychotropic medication, that she worked or was looking for work during the alleged disability period and that the psychiatric hospitalizations were for a length of time shorter than what would be considered to be "of extended duration"[; and t]he internal medicine consultative examiner['s] . . . opinion great weight because it is generally consistent with the limited

---

[4] The GAF Scale "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Pollard v. Halter, 377 F.3d 183, 186 n. 1 (2d Cir.2004). A GAF score between forty-one and fifty signals " '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' " Zabala v. Astrue, 595 F.3d. 402, 406 n. 2 (2d Cir.2010) (quoting Diagnostic and Statistical Manual of Mental Disorders (hereinafter "DSM-IV-TR") 34 (4th ed., Text Rev.2000)). A score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in school, work, and social functioning. See Kohler v. Astrue, 546 F.3d 260, 262 n. 1 (2d Cir.2008). A score between sixty-one and seventy reflects a person with " '[s]ome mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but [who is] generally functioning pretty well, has some meaningful interpersonal relationships.' " Id. at 262 (quoting DSM-IV-TR 34).

> medical evidence in the record regarding [Frawley's]
> physical condition.

T. 16-17.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be
> supported by substantial evidence because conclusory
> statements regarding plaintiff's capacities are not sufficient .
> . . Only after the ALJ has described the plaintiff's capabilities
> on a function-by-function basis supported by substantial
> evidence may RFC then be expressed in terms of the
> exertional levels of work, sedentary, light, medium, heavy,
> and very heavy.

DiVetro v. Comm'r of Soc. Sec., No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted). For the reasons explained infra, the ALJ's RFC decision is supported by substantial evidence

and should be affirmed.

### i. Treating Physician

Dr. Patil was Frawley's treating mental health provider.  When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ gave Dr. Patil's Mental Impairment Questionnaire (T. 472-477) little weight for the reasons outlined above.  In that Questionnaire, Dr. Patil noted that Frawley's current GAF score was 65, the same as last year's, and that her medical signs included inter alia mood disturbance, social withdrawal, isolation, pervasive loss of interests, generalized anxiety, feelings of guilt and worthlessness, suicidal ideation, and pathological dependance.  T. 472-73.  Dr. Patil noted (1) slight restrictions in Frawley's activities of daily living; (2) marked difficulties in maintaining social functional and marked deficiencies in maintaining concentration, persistance or pace; and (3) a history of three episodes of decompensation each for an extended duration.  T. 473.  Dr. Patil's prognosis was "extremely guarded".  T. 475.  Further, Frawley's impairments would

9

cause absence from work approximately three times per month.  Id.  Dr. Patil opined

that Frawley's (1) mental abilities to remember work procedures; understand, remember

and carry out short and simple instructions; and maintain attention for two hour

segments were very good or unlimited; (2) ability to sustain an ordinary work routine

and make simple work decisions was good; and (3) ability to work in coordination with

others; complete a normal work day or week without interruptions; accept instructions

and respond appropriately to criticism; get along with her coworkers without distracting

them; respond to changes in her work setting; and deal with normal work stresses was

marked.  T. 475-76.  Ultimately, Dr. Patil concluded that Frawley "exhibit[ed] depression

and anxiety that significantly impair[ed] her ability to perform independently and

consistently.  She ha[d] limited coping skills and poor adaptability[, as well as] difficulty

maintaining appropriate and productive boundaries."  T. 476.

The ALJ's decision to give Dr. Patil's opinion little weight should be affirmed.  First,

Dr. Patil's ultimate assessment was inconsistent with the treatment notes.  Outside of

arriving prior to an inpatient hospitalization, Frawley's GAF scores were consistently a

50 in 2008 (T. 344, 351, 354) and a 65 from sometime in 2009 through the date of the

Questionnaire (T. 433, 461, 472).  Frawley's GAF scores for the last three years prior to

the Questionnaire indicate "some mild symptoms . . . OR some difficulty in social [or]

occupational . . . functioning . . . but generally functioning pretty well, [and] has some

meaningful interpersonal relationships."  Kohler, 546 F.3d at 262 (citations omitted).

Such findings of mild symptoms and difficulties are inconsistent with Dr. Patil's

characterizations of Frawley's allegedly marked inabilities outlined above.  Further, this

is also inconsistent with Frawley's own testimony that she often socializes and has very

10

close relationships with her best friend and her best friend's extended family as well as her brother and sister-in-law. T. 39. Treatment notes also indicate that, beginning in 2008 and continuing on through the balance of Frawley's treatment, her symptoms were well controlled with medication and, when the medication became less effective, modifications of the medication regime and appropriate counseling resulted in Frawley's mood improving and ultimately feeling generally okay. T. 352, 354 (treatment notes from June of 2008 indicated that Frawley's anxiety was well controlled with medication rendering her asymptomatic and generally improving her condition); 455, 370 (treatment notes from December of 2010 indicating that Frawley's mood was improving); 451 (treatment notes from January of 2011 indicating Frawley's mood is stable); 450 (treatment notes from February 2011 indicating that while Frawley was not doing well, she had also not been compliant with her medication and was reminded how symptom management would only be successful with appropriate compliance); 446 (treatment notes from March 2011 indicating Frawley's compliance with medication and overall symptom improvement, as well as good concentration and focus); 445 (treatment notes from May 2011 indicating that Frawley was "doing pretty good" with her medications, which she was tolerating well, and was not in any major distress); 441 (treatment notes from July 2011 indicating that Frawley denies being depressed or suicidal and is tolerating her medications well); 436 (treatment notes from August 2011 indicating that Frawley continues to have anxiety but denies depression and has fair focus and concentration and an even, stable mood); 433 (treatment notes from September 2011 indicating Frawley is in "better spirits", that her depression is not bad and that she's tolerating the medication fairly well); 429 (treatment notes from

November 2011 indicating Frawley was "excited [and] . . . overall other than [her] financial problem[s], things [were] okay."); 480 (treatment notes from April 2012 indicating Frawley was anxious due to "some empty nest syndrome . . . [but o]therwise she is okay . . . not . . . terribly depressed . . . ." with a normal affect and mood).  It is worth noting that several of these notations were made by Dr. Patil after performing mental evaluations on Frawley.  T. 370, 429, 433, 441, 445, 450, 480.  Where the treatment notes of a treating physician are inconsistent with subsequent statements about functionality, the ALJ is not required to afford the treating physician's latter opinion controlling weight.  See e.g. Cichocki v. Astrue, 534 Fed. App'x 71, 75 (2d Cir. 2013).  The ALJ was correct in refusing to afford Dr. Patil's opinion great weight for the reasons stated above.

Further, the ALJ gave Dr. Patil's opinion little weight because of Frawley's work history and receipt of unemployment benefits during the treatment period.  While this employment did not rise to a level of substantial gainful employment, it was still appropriate for the ALJ to consider these facts in making his ultimate determination on disability; however, this will be discussed infra with regard to Frawley's credibility.

Lastly, the ALJ gave Dr. Patil's opinion little weight because it indicated more sustained episodes of decompensation than the medical record reflected.

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may

be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. § 404app. 1,12.00(B)(4). Frawley contends that her medical records indicate a period of extended decompensation beginning April 7,2008 through May 7, 2008. Pl. Memorandum of Law (Dkt. No. 10) at 16-17. Medical records indicate that Frawley was admitted to St. Joseph's Hospital from April 7, 2008 until April 17, 2008 due to vague suicidal thoughts brought upon by stresses in her life including her husband's death three years earlier and bankruptcy proceedings which caused her to lose her home and relocate to an apartment. T. 304, 315-320. Upon her discharge from St. Joseph's Hospital, it was noted that Frawley's medications had been increased which resulted in her feeling "less anxious and depressed," and "her mood improved," with a follow-up appointment scheduled. T. 316. Thus, Frawley's medical records indicate that she did have an episode of decompensation, but that it was not for an extended duration as it did not last for at least two weeks as outlined in the regulation above. Further, plaintiff's allegations of an extended episode of decompensation between this and the next hospitalization are further diminished because Frawley's symptoms improved from an

13

objective medical standpoint, hence her discharge.

On April 22, 2008, Frawley returned to St. Joseph's hospital claiming increased anxiety with more vague suicidal thoughts. T. 302. However, examination by the medical staff indicated that Frawley was "less agitated and restless than [her] last visit by [the provider's] memory. Her thoughts appear[ed] more rational . . . [s]he seems better able to process and verbalize her concerns [and while anxious and depressed, she was] . . . not as frantic appearing as before." T. 309. Accordingly, despite Frawley's subjective concerns that her anxiety had again flared, objective medical evidence indicates that she was still in an improved condition from when she initially arrived for her first hospitalization. This is not indicative of a constant decline as Frawley proffers, instead it shows progress, though not perfection, in her treatment.

Frawley was ultimately transferred to Community General Hospital where she was hospitalized through May 5, 2008. T. 293-302, 312-335. Treatment notes indicated that Frawley was taking medication for the two weeks prior to her hospitalization, though it was not wholly effective, but "[w]ith respect to her insight and judgment, [Frawley] did seem to have some insight to reach out for help and not to dwell on suicidal . . . or negative thoughts." T. 328. Frawley's medication was switched and the doseage adjusted, and upon her discharge it was noted that her mood had elevated and she was tolerating the medication well. T. 323. Additionally, her GAF score had increased from 25 to 50. T. 337, 344. Accordingly, while this constituted a period of decompensation, it too was less than two weeks and ultimately resulted an improvement in Frawley's condition.

The next hospitalization did not occur until December 10, 2010, two years after the

14

previous occurrences.  T. 364.  Frawley entered Oswego Hospital with vague complaints of "going downhill" and was admitted to inpatient status for four days.  T. 366-67, 373-74, 457-58.  It was noted upon her discharge that Frawley "tends to respond well to medications but does not respond well to stressors in her life," and that "her sleep, appetite [and] mood improved, affect brightened, anxiety and depression subsided . . . [and] did not demonstrate any such behaviors that would be indicative of her being dangerous to herself or others."  T. 367, 458.  Frawley was discharged with a GAF score of 60.  Id.  This is also a period of decompensation which fails to meet the extended duration requirements of the statute.

While there may be an argument to read the medical evidence as Frawley proffers, there is at least an equal if not greater argument to view the medical record as outlined above, providing substantial evidence that Frawley did not suffer from extended periods of decompensation as outlined by the regulations and concluded by the ALJ.  See Morales ex rel. Morales v. Barnhart, 218 F. Supp. 2d 450, 458 (S.D.N.Y. 2002) (citations omitted) ("The reviewing court may not . . . second guess the Commissioner's decision even if it might justifiably have reached a different result upon a de novo review," if substantial evidence adequate to support a conclusion of disability is present).

Accordingly, for the reasons cited above, substantial evidence supports the ALJ's decision to accord Dr. Patil's opinion as to Frawley's functional abilities little weight and the Commissioner's decision should be affirmed.

**ii. Substantial Evidence**

15

To the extent that Frawley contends that there was still evidence in the treatment records to conclude that her symptoms rendered her less able to perform the stated RFC, it is important to note that the question is not "whether there is substantial evidence supporting [Frawley's] . . . view . . . ; rather, . . . whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v.Colvin, 523 Fed. App'x 58, 59 (2d Cir. 2013) (citations omitted); see also Morales, 218 F. Supp. 2d at 458.

For the reasons stated above, the ALJ was both correct to accord Dr. Patil's opinion little weight and justified in determining that Frawley was not disabled.  For the same reasons cited, which indicate that Dr. Patil's Mental Impairment Questionnaire and its recommendations were contrary to the longitudinal medical evidence, that same evidence supplies substantial evidence for the ALJ's RFC determination.

Consistent with that medical evidence were the findings of psychological consultative examiner, Dr. Jeanne Shapiro.  T. 381-85.  Dr. Shapiro noted that "Frawley states that treatment has improved [her] symptoms, but some symptoms still occur . . . She denied any symptoms of depression and is not suicidal at the present time.  She gets nervous about going to work . . . [and] anxious about her finances."  T. 382.  Dr. Shapiro found Frawley to be cooperative with coherent and goal-directed thought processes, an adequate manner of relating and social skills, calm mood, and intact memory.  T. 383.  Dr. Shapiro also noted that Frawley had an average intelligence level and that her insight and judgment were fair.  T. 384.  The Mental Source Statement indicated that Frawley was capable of understanding, following and performing simple instructions and some complex tasks; capable of maintaining attention and concentration to complete tasks; able to regularly attend to a routine and maintain a

schedule even though she may not feel up to it; capable of learning new tasks, making

appropriate decisions, and relating to and interacting moderately well with others.  T.

384.  Dr. Shapiro noted that Frawley had some difficulty adequately dealing with stress,

though she ultimately concluded that Frawley's prognosis was good and hoped that

with continued intervention and support Frawley would find symptom relief.  T. 384-85.

   The ALJ's decision to give great weight to Dr. Shapiro's medical opinion is

supported by substantial evidence.  As previously discussed, Frawley had noted

improvements with consistent counseling and medication compliance.  Frawley also

had consistent GAF scores of 65 from 2009 through 2012.   The opinions of

consultative examiners like Dr. Shapiro may constitute substantial evidence where, as

here, it is supported by the medical evidence in the record.

> It is well settled that an ALJ is entitled to rely upon the
> opinions of both examining and non-examining State agency
> medical consults, since such consultants are deemed to be
> qualified experts in the field of social security disability.
> Such reliance is particularly appropriate where . . . the
> opinions of these . . . State agency medical consultants are
> supported by the weight of the evidence.

See Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y.

Jan. 19, 2011) (citations omitted); see also Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d

Cir. 1995) (explaining that "the opinions of nonexamining sources [can] override treating

sources' opinions provided they are supported by evidence in the record.") (citations

omitted); McEaney v. Comm. of Soc. Sec., 536 F. Supp. 2d 252, 256 (N.D.N.Y. 2008)

("the evaluations of non-examining State agency medical and psychological consultants

may constitute substantial evidence . . . An ALJ must treat such evaluations as expert

opinion evidence of non-examining sources . . . This treatment extends to . . . RFC

17

assessments [because] . . . [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted). Accordingly, for the reasons cited above, the ALJ's decision to accord Dr. Shapiro's opinion great weight and incorporate those mental functional limitations into his RFC assessment is appropriate. Accordingly, the ALJ's decision should be affirmed.

### 3. Frawley's Credibility

Frawley contends that the ALJ erred by considering Frawley's receipt of unemployment benefits and failing to consider Frawley's disabling pain. It is the duty of the ALJ, "not the reviewing courts, to appraise witness credibility." Carvey v. Astrue, 380 Fed. Appx. 50, 53 (2d Cir. 2010) (citations omitted). The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i) [The claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Here, the ALJ considered Frawley's subjective allegations of pain and disability, but reasonably found that they were not fully credible. T. 15. In so finding the ALJ discussed the factors outlined above, noting Frawley's non-compliance with her

medication, the improvements noted in her symptoms with compliance with her
medication, and the receipt of unemployment benefits.  Id.

   Frawley's medical record indicates instances of non-compliance with medication,
followed by a corresponding increase in her symptoms.  T. 304, 450.  Also, while not
relied upon by the ALJ, it is worth noting that it appears Frawley ceased attending any
sort of mental health treatment from approximately December of 2008 through the
summer of 2010.  T. 356, 460.  Frawley's credibility is diminished by her failure to seek
out treatment and non-compliance with her medication.  See 20 C.F.R. § 404.1530 (b)
(explaining that the failure to follow a prescribed treatment must be accompanied by a
good reason).  While "[c]ourts have observed that faulting a person with a diagnosed
mental illness for failing to pursue mental health treatment is a questionable practice,"
Cornell v. Astrue, No. 11-CV-1064, 2013 WL 286279, at *8 (N.D.N.Y. Jan. 24, 2013)
(citations omitted), the medical records indicate that Frawley generally possessed
normal cognitive function and judgement, even during her inpatient hospitalizations.  T.
362, 373, 383-84,425, 433, 436, 445, 446, 450, 453, 458, 460, 480, 483.  Thus, there
has been no good reason proffered by Frawley as to why she failed to seek out
treatment or follow her prescribed medication regime.

   Further, despite Frawley's contentions otherwise, the fact that Frawley collected
unemployment benefits during a portion of the period during which she claims disability
is extremely relevant to determining credibility.  T. 33 (testimony indicating Frawley
receives $107 in unemployment a week which was set to expire in July 2013); 42
(testimony indicating that Frawley was still receiving unemployment benefits but that
she felt that she was unable to work and had told "a white lie" when signing the

statement that she was "actively looking for work."). "By applying for such benefits[, despite her current contentions, Frawley] affirmed that she was ready, willing, and able to work." House v. Commissioner of Soc. Sec., No. 09-CV-913 (NAM/VEB), 2012 WL 1029657, at *12 (N.D.N.Y. Feb. 29, 2012). Frawley did not just affirm these facts, she also engaged in part time employment from December 2010 through March 2011. T. 446 (reporting that she "resigned her position [at Little Luke's] so she is trying to look for another part-time job that she could do."); 449, 452 ("struggling with her need to make decisions about full-time employment" and lamenting that "she wishes she [would have] tried harder earlier in this whole process to find work," given the fact that her "Social Security is ending in January [2011]," from her husband's death); 451 (reporting that she is "in the process of looking for a job wh[ich] would give her increased hours."); 453 (explaining that Frawley was concerned because her part time employment fluctuated between over twenty hours per week to ten hours per week); 455. Frawley also testified to the consultative examiner in March of 2011 "that she is able to work at the present time some of the time, and notes that some days she has to make herself get up and go to work," but that employment was still occurring. T. 381. Consideration of the receipt of these benefits and Frawley's part-time employment "was entirely proper and supported [the ALJ's] decision to discount [Frawley's] credibility." House, 2012 WL 1029657, at *12 (citing 20 C.F.R. §§ 404.1571, 416.971 (explaining that even if an individual is engaging in something less than "substantial gainful activity, it may show that you are able to do more work than you actually did.")).

Lastly, while not explicitly relied upon, it is worth noting that Frawley's daily activities also indicate that her symptoms were not as disabling as she alleged. Frawley reported

to both consultative examiners that she was able to independently perform her daily hygiene rituals, could cook and prepare food with help from her son, complete general chores, and enjoyed listening to the radio, watching television, reading, and visiting with her friend and family.  T. 384, 387.  Frawley testified that she drives; enjoys visiting with her best friend and family; does the daily chores, cleaning and laundry; enlists her sons to go grocery shopping as she generally dislikes that activity; and spends her time watching television, reading books and playing games on her computer.  T. 33, 38-40. These abilities in combination with the substantial evidence outlined in the medical record above help to bolster the ALJ's decision to deny disability benefits.

Therefore, the ALJ reasonably determined that Frawley's statements were not fully credible and his decision should be affirmed.


### 4. Step Five of the Sequential Analysis

Frawley contends that the ALJ erred in concluding she could perform work in the national economy.  To the extent that Frawley is re-alleging that substantial evidence did not support the ALJ's RFC or credibility determinations, such renewed contentions are similarly rejected for reasons already stated supra.

The ALJ determined that, with the assistance of a vocational expert's (hereinafter "VE") testimony, Frawley could perform work in the national economy at all exertional levels so long as certain restrictions given the stress level of the job were met.  T. 14-18.  Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability.  Pratt v. Chater, 94 F.3d 34, 38 (2d Cir. 1996).  The ALJ may apply the Grids or consult a VE.  See Heckler v. Campbell, 461 U.S. 458, 462

(1983); <u>Rosa v. Callahan</u>, 168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P,

App. 2 (2003). Here, a VE was questioned. The ALJ posed a hypothetical question to

the VE incorporating Frawley's RFC limitations, which are supported by substantial

evidence, as described above. <u>See</u> <u>Juleszo v. Barnhart</u>, 232 F.Supp.2d 44, 57

(W.D.N.Y.2002) (quoting <u>Totz v. Sullivan</u>, 961 F.2d 727, 730 (8th Cir.1992) (holding that

"the hypothetical question posed to a vocational expert must fully set forth a claimant's

impairments") (further citation omitted); <u>see</u> <u>also</u> <u>Dumas v. Schweiker</u>, 712 F.3d 1545,

1554 (2d Cir. 1983) (holding that there must be "substantial record evidence to support

the assumption upon which the vocational expert based his or her opinion."). To the

extent Frawley contends that the ALJ was required to consider more restrictions, or

incorporate them into the VE's questioning, such contentions are meritless.

<u>See</u> <u>Bossey v. Comm'r of Soc. Sec.</u>, No. 07-CV-116 (LEK/VEB), 2009 WL 1293492, at

* 12 (N.D.N.Y. May 5, 2009) ("Moreover, an ALJ is not required to include limitations in

hypotheticals that are not supported by substantial evidence in the record.") (internal

quotation marks and citations omitted). Based upon the vocational expert's testimony

and relying upon Medical–Vocational Rule 202.21 as a framework, the ALJ found that

there were a significant number of jobs in the national economy that Frawley could

perform as a laundry worker, DOT occupational code 361.685–018; sorter, DOT

occupational code 222.687-014; and janitor, DOT occupational code 381.687-018. T.

18.

　　　　Accordingly, it is recommended that the Commissioner's determination in this regard

be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Frawley's motion for judgment on the pleadings (Dkt. No. 10) be **DENIED** and the Commissioner's decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date:  October 29, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge